**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-61526-CIV-ALTONAGA/Goodman**

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

JEFFREY BROOKS, in his capacity
as personal representative of the Estate
of David H. Brooks,

       Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendant, Jeffrey Brooks's Amended Motion

to Dismiss the Amended Complaint [ECF No. 73], filed June 16, 2017.  The Court has carefully

reviewed the Motion; Amended Complaint [ECF No. 49]; Plaintiff, the Securities and Exchange

Commission's Response [ECF No. 80]; Defendant's Reply [ECF No. 86], and applicable law.

## I.      BACKGROUND

Jeffrey Brooks ("Defendant") was appointed Personal Representative of David H.

Brooks's ("Brooks['s]") Estate and has been substituted as Defendant in place of Brooks in this

case brought by the SEC.  (*See generally* Am. Compl.).  David Brooks founded DHB Industries,

Inc. ("DHB"), in 1992, and acted as Chief Executive Officer and Chairman of the Board from

1992 to 2006.  (*See id.* ¶¶ 10–11).  DHB was a holding company which did business through

subsidiaries Point Blank Solutions, Inc. and Protective Apparel Corporation of America.  (*See id.*

¶ 15).  After September 11, 2001, DHB, known for its bullet-resistant vests and other body armor

products, became one of the military's and law enforcement's largest suppliers of body armor. (*See id.* ¶ 16).

Brooks had a history of engaging in fraudulent business practices dating back to 1992, when, as a result of his involvement in insider trading, the SEC issued a permanent injunction and $405,000 civil penalty against him, and a five-year ban from associating with any broker or dealer. (*See id.* ¶ 10). In that time, Brooks continued to act in his position as CEO and Chairman of the Board at DHB. (*See id.*).

Brooks maintained strict control over the company's activities and over the small group of managers with whom he ran the company, including CFO Dawn Schlegel and COO Sandra Hatfield. (*See id.* ¶¶ 22–23). Brooks required numerous daily updates on every detail of the company's status and insisted on being party to every decision made in the company. (*See id.* ¶¶ 23–26). His approval was required before payments, disbursements, payroll, and even minor decisions such as the issuance of laptops to employees could be carried out. (*See id.* ¶ 26). Brooks had total control over the board of directors, comprised of friends and neighbors who catered to his every whim, and bribed those meant to monitor his activities into granting him free reign in how he conducted business at DHB. (*See id.* ¶ 28).

As identified by DHB's 2003 auditors, under Brooks's management, DHB failed to implement internal controls sufficient to assure accountability for its inventory, cost of goods sold, gross profit, gross margin, pre-tax income, net income, SG&A expenses, and other key figures in its filings and disclosures in conformity with U.S. Generally Accepted Accounting Principles ("GAAP"). (*See id.* ¶¶ 33, 104). The auditors further noted DHB had inadequate inventory controls, which included minimal inventory records, a lack of adequate quarterly physical inventory counts, and the use of outdated, unsupported, and inaccurate documentation

to value its inventory. (*See id.* ¶¶ 34, 105). Although DHB publicly acknowledged the weakness such deficiencies posed, Brooks failed to implement sufficient inventory controls. (*See id.* ¶¶ 33–34). While he personally reviewed all financial statements and disclosures included in DHB's filings, Brooks further failed to establish a sufficiently staffed or managed accounting department at DHB, which enabled him to commit fraud for years. (*See id.* ¶¶ 31, 45).

Brooks falsely represented to auditors in multiple signed letters between 2003 and 2005 that there had been no fraud involving management. (*See id.* ¶ 102). By signing DHB's Forms 10-K from 2003 and 2004, and DHB's Forms 10-Q from all of 2003 and 2004, as well as the first three quarters of 2005, Brooks certified the reports contained no untrue statements of fact, misstatements, or omissions, and the reports accurately represented DHB's financial condition, results of operations, and cash flows. (*See id.* ¶¶ 100–01). Despite those certifications, key figures in DHB's reports and proxy statements filed with the Commission and earnings releases, all of which Brooks helped edit and create, were habitually misrepresented from at least 2003 to 2005. (*See id.* ¶¶ 27, 40). DHB represented its gross profit margin as at least 27% at all times in this period, rather than the actual 14% in 2003 and 18% in 2004 and 2005. (*See id.* ¶ 41).

Brooks was aware Schlegel was overseeing and directing accounting practices to manipulate these figures during this period. (*See id.* ¶¶ 70–72). Schlegel and Brooks's manipulation acted to overstate DHB's gross profit in entries totaling $8.8 million in 2003, $7.1 million in 2004, and $10.9 million in 2005. (*See id.* ¶ 72). From 2003 to 2005, under Brooks's supervision, Schlegel and Hatfield falsely overstated and overvalued DHB's inventory to increase reported gross profit and net income, and fabricated documents to substantiate those claims. (*See id.* ¶¶ 44–47). DHB's ending inventory was overvalued by $24 million in 2003, $30 million in 2004, and $19 million in 2005. (*See id.* ¶ 58).

Concurrently with this fraudulent activity, Brooks used DHB's fraudulent business association with Tactical Armor Products ("TAP") to obtain substantial personal profits. (*See id.* ¶¶ 93–96). TAP was an armor plates manufacturer with DHB as its sole customer and Brooks's wife acting as its president. (*See id.* ¶¶ 94, 95). By virtue of and through his wife's position, Brooks ran all the company's operations, and was able to orchestrate an agreement between DHB and TAP whereby DHB would pay TAP's inflated labor costs and purchase TAP's entire inventory. (*See id.* ¶¶ 94, 97). Although Brooks represented the costs associated with that arrangement as routine manufacturing expenses in DHB's filings with the SEC, he used the agreement to funnel $10 million out of DHB for his personal benefit. (*See id.* ¶ 97).

Brooks was also known to take money directly from DHB via checks and credit cards to cover his extravagant personal expenses, such as prostitutes, luxury cars, jewelry, art, real estate, vacations, personal aircraft usage, horse training, designer clothing, and $122,000 worth of iPods distributed to the guests at his daughter's bat mitzvah. (*See id.* ¶¶ 28, 80). Brooks never repaid DHB for the expenses, although these purchases totaled at least $1.7 million between 1997 and 2002, $975,000 in 2003, $788,000 in 2004, and $1.3 million in 2005. (*See id.* ¶ 81).

Following inquiries by the SEC in 2004, Brooks cited a previously undisclosed 1997 Corporate Resolution, which had allegedly been unanimously approved by DHB's two-person compensation committee, to justify the use of company funds to cover his personal expenses. (*See id.* ¶¶ 86–87). The 1997 Corporate Resolution had purportedly agreed to reimburse Brooks for business or personal expenses for a total amount not to exceed 10% of DHB's annual net income. (*See id.*). Neither Schlegel nor one of the pre-2004 compensation committee members had ever seen or heard of the Corporate Resolution; it had never been disclosed to any auditors, was not mentioned in Brooks's employment agreement from 2000, and its legitimacy remained

unsupported due to the lack of DHB tracking or reporting of Brooks's personal expenses prior to 2004, as the document required. (*See id.* ¶¶ 87–91). Brooks fabricated the document with the help of the other member of the compensation committee, who made $2 million that year by selling DHB stock in a sale Brooks had arranged. (*See id.* ¶ 87). The fabricated 1997 Resolution was included in DHB's 2004 proxy statement, causing the filing to be materially false and misleading. (*See id.* ¶ 92).

DHB's filings for 2004 were further misleading due to inaccurate inventory numbers. (*See id.* ¶ 78). In 2004, after the U.S. Army changed specifications for its armor plates, $12.5 million of the armor plates DHB purchased from TAP became obsolete. (*See id.* ¶ 75). DHB failed to properly account for excess or obsolete inventory and failed to value its inventory at the lower of cost or market value, as required by GAAP. (*See id.* ¶¶ 74–75). As Brooks controlled and ran TAP through his wife, he would have known about the specification change and its effect on DHB, or would have been extremely reckless in not knowing. (*See id.* ¶ 76). Rather than disclosing the risk and uncertainty regarding the marketability of these plates or recognizing an obsolescence charge for the plates in DHB's 2004 Form 10-K, Brooks urged DHB's salesmen to try to sell the plates. (*See id.* ¶¶ 77–78). This omission caused DHB to overstate its inventory, gross profit, and pre-tax income for 2004 in the Form 10-K by at least $12.5 million. (*See id.* ¶ 78).

That year, before the information regarding Brooks's personal expenses being "reimbursed" by company funds became public knowledge, and while key figures represented the overstated inventory, gross profit, and pre-tax income, Brooks engaged in insider trading by selling 9.5 million DHB shares. (*See id.* ¶¶ 120–21). Between November 29, 2004 and December 29, 2004, Brooks sold about 60% of his shares for a profit of $185,893,750, which

was more than 275 times his 2004 salary. (*See id.* ¶¶ 122–30). At this time, DHB's stocks were trading near an all-time high, due in part to the concealment of the personal expense "reimbursement" from the public, and the misrepresented key figures in DHB's Form 10-Q, earnings releases, and Form 8-K, which had been reported in November of 2004. (*See id.* ¶¶ 120–29). When questioned about the accounting and financial practices at DHB, Brooks would become angry and threatening, indicating he was aware of the falsity of the key figures published in DHB's public filings. (*See id.* ¶ 36).

In late 2004 or early 2005, Point Blank's controller called these practices into question after noticing the inventory discrepancy caused by Hatfield's overvaluation of Point Blank's inventory at $9 million from $2 million for the quarter. (*See id.* ¶¶ 48–49). When the controller ordered Schlegel and Hatfield to correct the inventory, Schlegel and Hatfield acknowledged the discrepancy but refused to comply, causing the controller to resign and raise his concerns to DHB's auditors. (*See id.* ¶¶ 49–50). After being informed of the controller's complaints to the auditors, Brooks confiscated the controller's inventory analysis, violently ejected the controller from the premises, and told the auditors there was no problem with the inventory. (*See id.* ¶¶ 38–39, 50–52).

Under Hatfield's orders, the overstated inventory was used to value Point Blank's inventory at the end of the first quarter of 2005, which was approved by Schlegel and incorporated into DHB's earning releases and filings with the SEC. (*See id.* ¶¶ 55–56). Brooks approved the filings despite Schlegel noting she had no support for the numbers used, and he later commented that due to the inflated 2004 inventory, Hatfield would have to make up some numbers in 2005. (*See id.* ¶¶ 56–57). That quarter, Hatfield and Schlegel falsely increased DHB's ending inventory by 63,000 units, subsequently overstating DHB's inventory value by

$7.1 million and DHB's reported gross profit, net income, and other key figures for the quarter. (*See id.* ¶ 60).

In August 2005, on Brooks's suggestion, Schlegel attempted to account for these additional 63,000 units using the charge to earnings the company was to take following DHB's discontinuation of Zylon (a bullet resistant material) in its products after the National Institute of Justice decertified the material's use in government and law enforcement vests. (*See id.* ¶¶ 61–63). When DHB's 2006 auditors asked about the Zylon charge, Brooks falsely informed them DHB had written off the 63,000 units after the U.S. Army changed color requirements and the units sustained damage in a hurricane. (*See id.* ¶ 65). Brooks provided the auditors with fabricated inventory schedules to corroborate the existence of the 63,000 vests. (*See id.*). Upon learning of the lie, Schlegel admonished Brooks for foolishly fabricating a story for which the auditors would want more evidence and details. (*See id.* ¶ 67). When the auditors subsequently requested more support for the claims, Brooks stated the story and figures had been part of a deception by Schlegel and Hatfield that he had only recently uncovered. (*See id.* ¶ 68).

In March 2006, the auditors refused to issue a timely audit of the 2005 Form 10-K because of the unsupported figures in DHB's books and records, and subsequently informed Brooks they had identified fraudulent accounting at DHB. (*See id.* ¶ 35). Brooks attempted to conceal the fraud by obtaining a favorable audit for that year from an auditing firm he had secretly retained, and which only communicated with Brooks and Schlegel. (*See id.*). However, in April 2006, DHB filed two Forms 8-K admitting the unreliability of its interim reports for 2005, and the unreliability of its financials from 2003 and 2004. (*See id.* ¶ 20).

On August 17, 2006, the SEC filed a civil action against Schlegel and Hatfield, who were simultaneously charged by the United States Attorney's Office for the Eastern District of New

York, with violations of antifraud provisions of the securities laws and for having aided and abetted DHB's violations of the reporting, books and records, and internal controls provisions. (*See id.* ¶ 17). The two were criminally convicted. (*See id.*).

On October 1, 2007, after a year under new management working with forensic accountants to accurately reconstruct DHB's financial and accounting records and to restate its financial statements, DHB filed a comprehensive Form 10-K. (*See id.* ¶ 21). The Form 10-K included restated financial statements for fiscal years 2003 and 2004, which demonstrated the actual gross profit margins and net income for those years were materially lower than originally reported. (*See id.*). DHB is presently in bankruptcy, and was de-listed from the American Stock Exchange on July 7, 2006 for noncompliance with AMEX listing standards. (*See id.* ¶ 12).

At all times, due to Brooks's intensive involvement and oversight of all company decisions, as well as his participation in the fraudulent activity, Brooks knew or was extremely reckless in not knowing of the various forms of ongoing fraud. (*See id.* ¶¶ 43, 59, 66, 72–73, 79, 85, 101–02). On September 14, 2010, in a related criminal case, Brooks was convicted by a jury of charges related to securities, mail, and wire fraud, and was sentenced to 204 months' imprisonment in August 2013. (*See id.* ¶ 10).

Plaintiff's Amended Complaint brings fourteen claims for relief[1] against Defendant, seeking disgorgement, reimbursement of bonuses and profits from stock stales, and any further

---

[1] The claims are: Count I, Violations of Section 17(a)(1) of the Securities Act; Count II, Violations of Section 17(a)(2) of the Securities Act; Count III, Violations of Section 17(a)(3) of the Securities Act; Count IV, Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act; Count V, Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act; Count VI, Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act; Count VII, Violations of Section 10(b) and Rules 10b-5 of the Exchange Act (Insider Training); Count VIII, Aiding and Abetting Violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act; Count IX, Aiding and Abetting Violations of Sections 13(b)(2)(A) and (B) of the Exchange Act; Count X, Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1; Count XI, Violations of Rule 13b2-2 Promulgated under the Exchange Act; Count XII, Violations of Rule 13a-14 Promulgated under the Exchange Act; Count XIII, Violations of Section 14(a)

relief the Court deems appropriate. (*See id.* 132–81). Brooks died on October 27, 2016, and Defendant now moves to dismiss the complaint with prejudice, arguing the claims for relief abated upon Brooks's death or, in the alternative the Amended Complaint is an impermissible shotgun pleading.

## II.   STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual

---

of the Exchange Act and Rule 14a-9; and Count XIV, Failure to Reimburse: Violations of Section 304(a) of the Sarbanes-Oxley Act.

allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## III. ANALYSIS

### A. Survivability of Claims after Brooks's Death

#### 1. The Survivability Analysis

Defendant asserts the SEC's claims for relief do not survive Brooks's death. Absent an expression of contrary statutory intent, the survival of a federal cause of action after the death of a litigant is a question of federal common law. *See United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993) (citation omitted). "[R]esolution of the survivability issue depends on whether the recovery is deemed 'remedial' or 'penal.'" *Id.* (alteration added). Remedial actions survive the death of the plaintiff, but penal actions do not. *See id.*

Following Brooks's death, the SEC filed its Amended Complaint, omitting previous requests for civil penalties and injunctive relief and limiting the requested relief to disgorgement of ill-gotten gains for violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), and for reimbursement of bonuses and profits from stock sales under section 304 of the Sarbanes-Oxley Act. (*Compare* Am. Compl. 37, *with* Complaint for Injunctive and Other Relief [ECF No. 1] 31–32 (listing as requested relief civil penalties and request for an officer and director bar, in addition to disgorgement and reimbursement of bonuses and profits)).

Relying on the recent case of *Kokesh v. SEC*, 137 S. Ct. 1635, 1640 (2017), which analyzes whether disgorgement is a penalty, Defendant contends even the SEC's more limited requests for relief in the Amended Complaint abated upon Brooks's death. The parties agree *NEC* sets out a helpful test for determining whether a statute is penal or remedial for abatement

purposes (*see* Mot. 6; Resp. 10), although, as Defendant notes, the *NEC* factors are not dispositive and courts do not always strictly apply the factors in making survivability determinations (*see* Mot. 6–7 (citations omitted)).

*NEC* explains a remedial action generally seeks an individual remedy for "specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." 11 F.3d at 137. Its three-factor test to assist in determining whether a statute is penal or remedial asks: "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Id.* (citations and internal quotation marks omitted).

As the SEC notes, courts considering the *NEC* factors and similar tests have liberally interpreted federal causes of action as remedial for abatement purposes. (*See* Resp. 22–24 (citing cases)). In these cases, civil sanctions qualify as remedial, even when they constitute penalties or have punitive functions, so long as they also serve a remedial purpose. (*See id.*).

In *United States v. Land, Winston County*, 221 F.3d 1194 (11th Cir. 2000), for instance, the Eleventh Circuit determined 18 U.S.C. section 1955, which permits the forfeiture of property used in illegal gambling, was remedial and not punitive, and the government's claim under the statute survived the death of the property owner. *See Winston Cty.*, 221 F.3d at 1198. The court noted "while forfeiture statutes may have 'certain punitive aspects, [they] serve important nonpunitive goals.'" *Id.* (alteration in original) (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). "[F]orfeiture . . . serves a deterrent purpose distinct from any punitive purpose," *id.* (first alteration added; internal quotation marks and citation omitted); specifically, forfeiture is "designed primarily to confiscate property used in violation of the law, and to require

disgorgement of the fruits of the illegal conduct," *id.* (internal quotation marks and citation omitted). It operates as a remedy "in contrast to the imposition of incarceration or a fine imposed on the wrongdoer." *Id.* at 1199 (citation omitted).

Other courts considering the question of abatement of claims, including in cases brought by the government, have similarly concluded claims for civil penalties sought under federal statutes survive the death of a litigant. *See, e.g.*, *Lee v. Comm'r of Internal Revenue*, 227 F.2d 181, 183 (5th Cir. 1955) (finding civil fraud penalties "are but civil administrative sanctions of a remedial character in aid of the assessment and collection of taxes, and . . . [are] not to be treated as penal sanctions which die with the offender" (alterations added)); (*see also* Resp. 22–23). The same has been true in several cases considering claims brought under the Securities Act and the Exchange Act. (*See* Report 23 n.10).

In the Amended Complaint, the SEC requests disgorgement and reimbursement of profits. The Court analyzes whether first the disgorgement and then the reimbursement sought by the SEC are remedial for abatement purposes and so survive Brooks's death.

The equitable remedy of disgorgement is a "form of restitution measured by the defendant's wrongful gain." *Kokesh*, 137 S. Ct. at 1640 (alteration, internal quotation marks, and citation omitted). Although SEC enforcement actions seeking disgorgement are of an undeniably public nature, *see SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004) (citation omitted), "disgorgement is imposed not to punish, but to ensure illegal actions do not yield unwarranted enrichment," *Osborn v. Griffin*, No. 16-6221, 2017 WL 3205826, at *25 (6th Cir. July 28, 2017) (quoting *SEC v. Contorinis*, 743 F.3d 296, 306–07 (2d Cir. 2014)). Additionally, the recovery authorized with disgorgement is not "wholly disproportionate to the harm suffered," *NEC*, 11 F.3d at 137 (citation omitted), since a "court's power to order disgorgement extends

only to the amount with interest by which the defendant profited from his wrongdoing," *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). Although disgorgement is not always compensatory and there is no statutory command it should be, *see Kokesh*, 137 S. Ct. at 1644, the SEC points out all proceeds from disgorgement of Brooks's profits here will be used to compensate harmed investors (*see* Resp. 10, 33–34). In this way, the disgorgement requested by the SEC is not unlike the civil forfeiture in *Winston County*, which sought primarily to recover the ill-gotten gains of a wrongdoer. *See* 221 F.3d at 1198.

In addition to disgorgement, the SEC seeks reimbursement under section 304 of the Sarbanes-Oxley Act. When a company's financial statements are restated after material noncompliance with financial reporting requirements, section 304 requires a CEO to reimburse the company for profits or bonuses received during the restated period. *See* 15 U.S.C. § 7243. As with disgorgement sought under the Securities Act and the Exchange Act, the Sarbanes-Oxley Act and section 304 broadly seek to redress wrongs to the public. However, like disgorgement under these Acts, section 304 reimbursement is of a remedial nature in that it "reimburse[s] the issuer," that is, the company. 15 U.S.C. § 7243(a) (alteration added). Section 304 is thus oriented toward redressing "specific harm suffered" by the issuer, *NEC*, 11 F.3d at 137, and recovery under the statute flows to the company, not to the public.

Defendant points out section 304 liability does not require a causal link between the financial restatement and the reimbursement, such that the reimbursement could be "massively disproportionate" to any harm suffered by a company. (Mot. 22 (internal quotation marks omitted); *see id.* 21–22). Courts have concluded a statute is remedial in the abatement context even when the amount of damages appears disproportionate from the harm suffered if the overall purpose of the statute is intended to remedy a wrong to an individual as opposed to a wrong

against the state. *See Matter of Wood*, 643 F.2d 188, 191–92 (5th Cir. 1980) (finding remedial for abatement purposes the Truth in Lending Act's provision affording a debtor statutory damages for twice the amount of any finance charge for a creditor's failure to disclose required information upon determining the statute's purposes are remedial); *see also Malvino v. Delluniversita*, 840 F.3d 223, 229–230 (5th Cir. 2016). Accordingly, reimbursement under section 304, like disgorgement, is remedial in nature for abatement purposes and did not abate upon Brooks's death here.

### 2. *Kokesh* and Its Relevance to the SEC's Claims

Relying on Supreme Court guidance in *Kokesh*, Defendant contends the SEC's claims seeking disgorgement are penal in nature because disgorgement is a penalty. (*See* Mot. 2). Defendant maintains the SEC's remaining claim, brought under section 304, is also a penalty and, because it is based on a penal statute, cannot survive Brook's death. (*See id.*). The SEC argues *Kokesh* analyzes whether securities laws are penalties in the context of determining the applicable statute of limitations and its holding is therefore inapposite in the survivability realm. (*See* Resp. 24–25).

*Kokesh* involved interpretation of 28 U.S.C. section 2462, which provides a five-year statute of limitations applies to actions or proceedings, including those brought by the SEC to obtain statutory monetary penalties, for the enforcement of "any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462; *see also Kokesh*, 137 S. Ct. at 1640–41 (citing *Gabelli v. SEC*, 568 U.S. 442, 454 (2013)). The dispute in *Kokesh* required the Supreme Court to determine whether disgorgement is a "civil fine, penalty, or forfeiture" under section 2462 such that the five-year statute of limitations applies to actions seeking disgorgement. *See* 137 S. Ct. at 1641. In analyzing whether disgorgement is a penalty, the Court stated "whether a sanction represents a

penalty turns in part on 'whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual.'" *Id.* at 1642 (quoting *Huntington v. Attrill*, 146 U.S. 657, 668 (1892)). It further explained "a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner' — as opposed to compensating a victim for his loss." *Id.* (quoting *Huntington*, 146 U.S. at 668).

Applying these legal principles, the Court had no trouble in concluding "SEC disgorgement constitutes a penalty within the meaning of [section] 2462." *Id.* at 1643 (alteration added). The Court noted in such cases, "[t]he violation for which the remedy is sought is committed against the United States rather than an aggrieved individual." *Id.* (alteration added). Additionally, the Court found "SEC disgorgement is imposed for punitive purposes," with deterrence of future securities laws ranking as a primary objective. *Id.* Finally, the Court observed SEC disgorgement is frequently not compensatory. *See id.* at 1644.

Despite Defendant's assertion *Kokesh* is "definitive, controlling law that SEC disgorgement is a penalty" for abatement purposes (Mot. 2), *Kokesh*'s holding cannot be plucked from the statutory context that gives it force. *Kokesh* is about statutes of limitations, and its holding is embedded in this context. Its first paragraph could not make this sentiment plainer: "[d]isgorgement in the securities-enforcement context is a 'penalty' *within the meaning of [section] 2462*, and so disgorgement actions must be commenced within five years of the date the claim accrues." 137 S. Ct. at 1639 (emphasis and alteration added). The Court's preface to the analysis in section II offers a brief word on the purposes underpinning statutes of limitations, and the Court's ensuing discussion should be understood against that backdrop. *See id.* at 1641–42. Indeed, at every step of the analysis, the Court reinforces it is discussing penalties in the context of a specific provision and for statute of limitations purposes. *See id.* at 1643

("'[P]enalties' *in the context of § 2462* 'go beyond compensation, are intended to punish, and label defendants wrongdoers[.]'" (emphasis and second alteration added) (quoting *Gabelli*, 568 U.S. at 451–52)); *id.* ("Application of the foregoing principles readily demonstrates that SEC disgorgement constitutes a penalty *within the meaning of § 2462*." (emphasis added)); *id.* at 1645 ("Disgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty *under § 2462*." (emphasis added)).

Certainly, as Defendant points out, the analysis *Kokesh* uses to determine whether disgorgement is a penalty under section 2462 is the same or similar to the general analysis used to determine whether a statute is penal or remedial for abatement purposes. (*See* Mot. 10). But *Kokesh* was analyzing whether disgorgement can be considered a "penalty" under a specific statutory provision, not whether disgorgement is sufficiently penal and non-remedial in nature for survivability purposes. A penalty with remedial aspects is rightly still a "penalty" under section 2462.

The mere fact a claim seeks a "penalty" under a specific statutory provision does not mean the action is penal for the purposes of survival. *See Wood*, 643 F.2d at 190 ("That a penalty is imposed, however, does not end our inquiry. We must still determine whether a [Truth in Lending Act] action for statutory damages is penal for the purpose of survival. . . . [T]he term penal is used in different contexts to mean different things." (alterations added; internal quotation marks and citation omitted)). To conclude a "penalty" in one statute categorically qualifies as penal across other legal contexts and for abatement purposes in particular is to ignore Eleventh Circuit case law specific to the abatement context. This precedent suggests sanctions that serve both remedial and penal purposes can survive the death of a defendant. *See, e.g.*, *Winston Cty.*, 221 F.3d at 1198. As the SEC points out, "in the

survival context, dual purpose sanctions are not penal and do not abate upon death." (Resp. 25 (emphasis omitted); *see also id.* 25–26 (citing cases)). Defendant has not cited a single case specific to the abatement context where a dual-purpose sanction, like the ones requested by the SEC in this case, dies with the party.

### B. Shotgun Pleading

In the final pages of its Motion, Defendant alternatively argues the Amended Complaint should be dismissed as a shotgun pleading. (*See* Mot. 25–28).

Perhaps the most common version of a "shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (*i.e.*, all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, LLC. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Shotgun pleadings make it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). Therefore, "shotgun pleadings are routinely condemned by the Eleventh Circuit." *Real Estate Mortg. Network, Inc. v. Cadrecha*, No. 8:11-cv-474-T-30AEP, 2011 WL 2881928, at *2 (M.D. Fla. July 19, 2011) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991)); *see also Strategic Income Fund*, 305 F.3d at 1295 n.9 (citing cases).

The SEC's Amended Complaint provides an exhaustive chronological narrative of the alleged misconduct and securities violations that form the basis of this action, as summarized in this Order. (*See* Am. Compl. ¶¶ 1–131). Yet, Defendant faults Plaintiff for setting forth 14 "boilerplate causes of action — which recite the elements of each claim without any factual

detail and which re-incorporate and re-allege all of the factual allegations in the [A]mended [C]omplaint." (Mot. 26 (alterations added; emphasis removed).

Each of the counts is careful to incorporate only the factual allegations of paragraphs 1 through 131 and not the paragraphs of other counts, so this is not a situation where most of the counts "contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund*, 305 F.3d at 1295. Additionally, although Defendant is "unsure of" which factual allegations support each claim (Mot. 26), "[t]hose general allegations support each claim for relief and identify the relevant events, misrepresentations, and omissions advanced by the SEC," *SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1354 (S.D. Fla. 2013) (alteration added). Here, as in *City of Miami*, "[t]he Court sees no difficulty in reviewing the sufficiency of each count of the SEC's [Amended] Complaint by considering the allegations stated in paragraphs 1 through [131], all of which the SEC intends to have support each count by its incorporation thereto." *Id.* at 1355 (alterations added).

For these reasons, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 73]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida this 3rd day of August, 2017.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record